**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**KEY WEST DIVISION**

**Case No.: 4:23cv10069-JEM-Martinez**

JAMES R. SANER, II, as Personal
Representative of the Estate and
Survivors of KIRA LYNN SANER,

      Plaintiff,

v.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY,

      Defendant.

_____/

## DEFENDANT, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY'S MOTION FOR FINAL SUMMARY JUDGMENT
### (Dispositive Motion)

Defendant, State Farm Mutual Automobile Insurance Company ("State Farm"), by and through its undersigned attorneys and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, hereby moves this Court for an order granting final summary judgment in favor of State Farm and against Plaintiff.

## INTRODUCTION

This is a third-party common law bad faith action brought by a third-party claimant, James R. Saner, II, as Personal Representative of the Estate and Survivors of Kira Lynn Saner. Ms. Saner was killed in a motor vehicle accident caused by State Farm's insured on October 30, 2021. (ECF No. 24 at ¶ 1.) In a phone call eleven days

after the accident, State Farm offered the $25,000 policy limits to Mr. Saner to settle his wife's wrongful death claim. (ECF No. 24 ¶ 10.)  State Farm confirmed the settlement offer in a letter to Mr. Saner later that day. (ECF No, 24 at ¶ 11.)  Over the next four months, State Farm wrote three additional letters and made two phone calls to Mr. Saner to follow up on its settlement offer. (ECF No. 24 ¶¶ 16, 17, 19, 20, and 23.) In early April of 2022, Mr. Saner retained Attorney Sean Cleary, who advised him that State Farm had improperly handled the claim by failing to tender a check to him as part of its settlement offer and recommended that he reject State Farm's offer of the policy limits. (ECF No. 22 ¶ 36, 41.) Mr. Saner thereupon rejected State Farm's offer of the policy limits. A wrongful death suit was filed in April of 2022 and Mr. Saner obtained a judgment for $7.5 million pursuant to a *Cunningham* agreement. (ECF No. 24 ¶ 42.) In the present bad faith action, Mr. Saner alleges State Farm is liable for the payment of the judgment because it failed to tender a check for the policy limits as part of its pre-suit settlement offer. (ECF No. 1 ¶¶ 18, 23, 30(f).)

## SUMMARY OF FACTS

The formal Statement of Material Facts (ECF No. 24) has been filed separately, as required by Local Rule 56.1, along with the Joint Statement of Undisputed Facts (ECF No. 25), as required by this Court's Scheduling Order (ECF No. 10 at pp. 5-6). The following summarizes the material facts underlying Plaintiff's claim.

This is a third-party bad faith case brought pursuant to the common law of Florida.  State Farm's insured, Jeffrey Schnierle, caused a motor vehicle/motorized scooter accident on October 30, 2021, resulting in the death of Kira Lynn Saner. (ECF

No. 24 ¶ 1.) After the arrival of the police at the scene of the accident, Mr. Schnierle took his own life while sitting in his vehicle. (*Id*. at ¶ 2.)

State Farm offered the $25,000 policy limits to Ms. Saner's husband eleven days after the accident. (ECF No. 24 ¶ 10.) During the phone call between Claim Specialist Joe Willis and Mr. Saner, CS Willis explained: 1) that the applicable bodily injury liability policy limits were $25,000; 2) that State Farm was willing to pay the limits to resolve the claim; 3) that State Farm would send a proposed release to Mr. Saner for him to sign; and 4) that State Farm would send him a check after it received the executed release. (*Id*.) During this call, Mr. Saner asked State Farm to email him the policy and CS Willis verified Mr. Saner's email. Mr. Saner told CS Willis that he will review the release and policy information before signing the release. (*Id*.) CS Willis advised Mr. Saner to take his time and review all the information sent to him. (*Id.*)

After speaking with Mr. Saner on November 10, 2021, State Farm sent an offer letter to Mr. Saner later that day, enclosing a proposed release and again stating that after the release is signed and returned to State Farm, State Farm will send him a check for $25,000. (ECF No. 24 ¶ 11.)  Seven days later, on November 17, 2021, State Farm sent to Mr. Saner an insurance disclosure letter, wherein State Farm accurately disclosed, under penalties of perjury, the applicable policy limits of $25,000 per person and provided Mr. Saner with a copy of the policy booklet and the applicable declarations page for the policy. (ECF No. 24 ¶ 14.) Shortly thereafter, on November 26, 2021, Mr. Saner spoke with State Farm and requested a copy of the policy. (ECF No. 24 ¶ 16.) Later that day, State Farm emailed Mr. Saner a copy of the declarations

page. (*Id.*) Two days later, Mr. Saner emailed State Farm acknowledging receipt of the declarations page and thanking State Farm for sending it to him. (*Id.*)

Because Mr. Saner did not respond to the November 10, 2021 letter, State Farm sent him a follow up letter on November 30, 2021. (ECF No. 24 ¶ 17.) Again, Mr. Saner did not respond. (*Id.*) On December 10, 2021, CS Willis called and spoke with Mr. Saner, who told CS Willis that he had retained an attorney who is reviewing the release. (ECF No. 24 ¶ 19.) CS Willis told Mr. Saner that State Farm will need a letter from the attorney and that all communications will need to go through the attorney. Mr. Saner did not provide State Farm with the name of his attorney. (*Id.*)

On January 4, 2022, State Farm wrote another letter to Mr. Saner to follow up on the proposed release and again stated State Farm will issue its settlement check to him once State Farm receives the signed release. (ECF No. 24 ¶ 20.) Again, Mr. Saner did not respond. On February 28, 2022, State Farm sent its third follow up letter to Mr. Saner. (ECF No. 24 ¶ 23.) In this letter, State Farm asked whether Mr. Saner had an opportunity to get an estate set up. (*Id.*) Mr. Saner responded on March 8, 2022, when he sent an email to State Farm requesting payment of his scooter claim and stating he did not need to set up an estate because he is "still living." (ECF No. 24 ¶ 25.) Later, on March 26, 2022, Mr. Saner sent two emails to State Farm wherein he: 1) complained that State Farm had not paid the property damage claim relating to the damage to the scooter, and 2) requested that State Farm provide the "proper" declarations page for the policy. (ECF No. 24 ¶¶ 26, 27.)

A few days later (in early April 2022), Mr. Saner retained Attorney Cleary, who filed suit against Schnierle on April 6, 2022. (ECF No. 24 ¶¶ 28, 32.) On April 29, 2022, Attorney Cleary sent an email to State Farm rejecting the settlement offer and accusing State Farm of bad faith based on the following actions: 1) State Farm's failure to tender the limits, 2) State Farm's inclusion of Tracie Sieve (a "non-insured and non-involved person") on the release, "which State Farm required to be signed notwithstanding the fact that no tender was ever made," 3) not attempting in good faith to settle the claims, 4) failing to promptly settle the claims when the obligation to settle the claims had become reasonably clear, 5) bad faith negotiation of the property damage claim, 6) failing to include Mr. Schnierle's estate on the release, 7) harassing calls and claim practices, 8) potentially exposing Ms. Sieve to a claim; and 9) unspecified "coercive settlement tactics." (ECF No. 24 ¶ 35.)

The Saner lawsuit against Mr. Schnierle's estate was resolved through a *Cunningham* agreement, wherein: 1) the parties agreed to the entry of a final judgment against Mr. Schnierle's estate in the amount of $7.5 million, 2) Mr. Saner agreed not to enforce the final judgment against Schnierle; and 3) State Farm's liability, if any, for the judgment would be determined in a bad faith action. (ECF No. 24 ¶ 42.)

## SUMMARY OF ARGUMENT

State Farm is entitled to summary judgment because no reasonable jury could find that State Farm acted in bad faith. State Farm's claim handling was reasonable, as a matter of law, as it is undisputed that State Farm offered its $25,000 policy limits to Mr. Saner to settle his wife's wrongful death claim just eleven days after the

accident, and repeatedly followed-up with Mr. Saner on four additional occasions over the next four months, during which time Mr. Saner never communicated any concerns about State Farm's settlement offer or proposed release.

Plaintiff never made a settlement offer for the $25,000 policy limits or otherwise communicated a willingness to settle for the policy limits. (ECF No. 24 ¶ 39.) Plaintiff's primary bad faith argument is that State Farm failed to "timely tender" a check for the policy limits on or about November 10, 2021, when State Farm offered its policy limits to Mr. Saner and asked him to sign a proposed release before receiving the settlement check. (ECF No. 1 ¶¶ 18, 23, 30(f)). Plaintiff alleges State Farm should have tendered (i.e., delivered) the check to Mr. Saner, rather than merely offering to do so, even though Mr. Saner was not represented by counsel at the time. In fact, as explained more fully below, no Florida law or industry standard requires a liability insurer to tender its policy limits to an unrepresented third-party claimant without first securing an executed release to protect its insured. Where, as in the present case, a claimant is not represented by counsel, the industry standard is to initiate settlement discussions through an offer and to thereafter send a settlement check after the release has been executed by the claimant and returned to the insurer. That is exactly what State Farm did.

Attorney Cleary testified that a second reason he refused to accept the policy limits was because he thought State Farm provided him (and Mr. Saner) with the incorrect declarations page for the policy. (ECF No. 24 ¶ 36.) However, the record shows that State Farm did in fact provide Mr. Saner with an accurate declarations page

6

as part of State Farm's insurance disclosure letter of November 17, 2021, and again on November 26, 2021, when State Farm emailed Mr. Saner another copy of the declarations page. (ECF No. 24 ¶¶ 14, 16.) Two days later, Mr. Saner emailed State Farm acknowledging receipt of the declaration page and thanking State Farm for sending it to him. (ECF No. 22 ¶ 16.) State Farm also provided Attorney Cleary with an accurate declarations page as part of State Farm's insurance disclosure letter on May 2, 2022. (ECF No. 24 ¶ 40.) Attorney Cleary assumed that the declarations page (which shows a "policy period" of October 28, 2019 to January 3, 2020) was incorrect because the subject accident occurred on October 30, 2021 – a date that does not fall between October 28, 2019 to January 3, 2020. (ECF No. 24 ¶ 36.) The record shows, however, that Attorney Cleary's assumption was wrong.  State Farm does not (as a general business practice) create a new declarations page upon policy renewal; it only creates a new declarations page when an insured makes certain changes to his or her coverage. (ECF No. 24 ¶ 31.) Mr. Schnierle's declarations page states the policy consists of the declarations page, policy booklet Form 9810A, and any endorsements that apply, "including those issued to you with any subsequent renewal notice." (ECF No. 22-1 at p. 2.) The policy booklet states, "We agree to renew this policy for the next policy period upon payment of the renewal premium when due." (ECF No. 22-1 at p. 46.) Thus, if Mr. Saner or Attorney Cleary had read the declarations page (which State Farm provided to Mr. Saner on November 17, 2021 and November 26, 2021 and to Mr. Creary on May 2, 2022) and the policy booklet (which State Farm provided to Mr. Saner on November 17, 2021 and to Attorney Cleary on May 2, 2022), they would

have understood that the policy period stated on the declarations page is extended when the insured pays a renewal premium, and thus the actual policy period will not necessarily be the one stated on the declarations page.

Attorney Cleary testified that a third reason he advised Mr. Saner not to accept the policy limits was because the proposed release State Farm sent to Mr. Saner included, as a released party, Tracy Sieve (Mr. Schnierle's fiancé), who was not an insured under the policy. (ECF No. 36.) In fact, the record shows that the inclusion of Ms. Sieve on the proposed release was, at most, simply a mistake and the result of mere negligence. The record shows State Farm added Ms. Sieve to the release because Ms. Sieve told the claim specialist that she was Mr. Schnierle's wife. (ECF No. 24 ¶ 5.) State Farm was later informed that Ms. Sieve was not Mr. Schnierle's wife. (*Id.*) Moreover, as a matter of law, Ms. Sieve faced no potential liability in connection with the accident, as she was not involved in the accident and did not own the Schnierle vehicle. Thus, because Ms. Sieve faced no liability in connection with the accident, there was no reason to add her to the release. Neither State Farm nor its insured (the Estate of Mr. Schnierle) gained anything by adding her to the release.

Moreover, because Ms. Sieve faced no potential liability in connection with the accident, there was no legitimate reason for Plaintiff to reject State Farm's settlement offer merely because Ms. Sieve's name was on the release. If Plaintiff had any concerns about Ms. Sieve being named on the release, Plaintiff could have simply asked State Farm to remove her. The record reflects, however, that Plaintiff never communicated to State Farm Plaintiff's purported concern about Ms. Sieve being on the release. (ECF

No. 24 ¶ 15.) Mr. Saner claims he called State Farm on that topic, but he admitted he does not recall when he called, who he spoke with on that matter, or what State Farm told him. (*Id.*)

Based on the undisputed facts, State Farm acted reasonably and with due regard for the interests of its insured (the Estate of Mr. Schnierle). Plaintiff has not, and cannot, come forward with evidence that would support a finding of bad faith against State Farm. Thus, summary judgment should be entered in favor of Defendant.

## MEMORANDUM OF LAW

### I.      Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

When a party moving for summary judgment demonstrates the absence of a genuine issue of material fact, the burden then shifts to the non-moving party to establish the existence of evidence from which a reasonable jury may return a verdict in his favor. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002). This requires the non-moving party to do more than simply show "some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986).

In an action for bad faith against an insurer, summary judgment is appropriate where a jury could not reasonably conclude that an insurer acted in bad faith based on the evidence proffered. *See Montanez v. Liberty Mut. Fire Ins. Co.*, 824 Fed. App'x 905, 910 (11th Cir. 2020). Stated differently, summary judgment is appropriate "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Aldana v. Progressive Am. Ins. Co.*, 828 Fed. App'x 663, 668 (11th Cir. 2020) (quoting Anderson, 477 U.S. at 249). A non-moving plaintiff bears the burden of coming forward with evidence of each essential element of the claim such that a reasonable jury could find in his favor. *Mattadeen v. State Farm Mut. Auto. Ins. Co.*, No. 04-80034-CIV, 2004 WL 6247906, at *3 (S.D. Fla. Dec. 23, 2004) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990)). The existence of a "scintilla of evidence" in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* (citing *Anderson*, 477 U.S. at 252).

While the issue of whether an insurer acted in bad faith is ordinarily a question for the jury, courts have, in certain circumstances, concluded as a matter of law that the insurance company did not act in bad faith. *See, e.g., Daniels v. GEICO Gen. Ins. Co.*, 740 F. App'x 665, 668 (11th Cir. 2018) (citation omitted); *Shin Crest PTE, Ltd. v. AIU Ins. Co.*, 605 F. Supp. 2d 1234, 1240 (M.D. Fla. 2009); *Maldonado v. First Liberty Ins. Corp.*, 546 F. Supp. 2d 1347, 1354 (S.D. Fla. 2008) (entering summary judgment for an insurer where no reasonable jury could find that the insurer acted in bad faith);

*Williams v. Geico Gen. Ins. Co.*, No. 4:04cv173-SPM/AK, 2005 WL 6964878, at *6 (N.D. Fla., March 4, 2005), *aff'd*, 143 Fed. App'x 275 (11th Cir. 2005).

## II.    There is insufficient evidence to support a jury finding of bad faith

### A.    In the absence of a settlement demand within policy limits, State Farm was only required to initiate settlement negotiations, not to guess correctly what undisclosed nonmonetary terms Plaintiff desired.

In most jurisdictions, an insurer cannot be held liable for an excess judgment against an insured unless an offer had been made to the insurer or insured to settle the claim against the insured within policy limits. *See, e.g.*, *Cotton States Mut. Ins. Co. v. Fields*, 128 S.E.2d 358, 359-60 (Ga. Ct. App. 1962); *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 848-52 (Tex. 1994). Florida recognizes a limited exception to this rule in that a Florida liability insurer has a duty to initiate settlement negotiations, even in the absence of a formal demand, where: (1) the insured's liability is clear; and (2) the claimant's damages clearly exceed the limit of the insured's liability limit. *See Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So. 2d 12, 14 (Fla. 3d DCA 1991).

But the duty to initiate settlement negotiations in the absence of a formal demand (the "*Powell* duty") is just that: a duty to *initiate* settlement negotiations. It is *not* a duty to tender an *irresistible* offer or to guess correctly what undisclosed nonmonetary terms the claimant desires to see included in the initial offer. The scope of the *Powell* duty was directly addressed in *Boateng v. Geico Gen Ins. Co.*, No. 10-CIV-60147, 2010 WL 4822601 (S.D. Fla. Nov. 22, 2010), which involved a tragic accident that killed Mr. Boateng's wife and severely injured his son. *Id.* at *1.

In *Boateng*, the insurer offered to settle both claims within six days of the accident. *Id.* The insurer sent a letter confirming that it would be delivering an offer of policy limits, following up with a phone call explaining that it was offering $10,000 on the injury claim and $10,000 on the wrongful-death claim. *Id.* A week later, an adjuster visited Mr. Boateng at home and brought one $10,000 check for the injury claim, but she did not bring a second check for the wrongful-death claim because no estate had been opened yet. *Id.* Mr. Boateng claimed to have become suspicious that the insurer was trying to trick him into settling *both* claims for $10,000 instead of settling them for $10,000 each, but he never expressed this concern to the insurer or asked to resolve both claims for the combined $20,000 limits. *Id.* at *4. On the insurer's motion for summary judgment in an ensuing bad faith action, the *Boateng* court rejected the plaintiff's argument that the *Powell* duty required anything more than the making of an opening offer, even if an imperfect one. Instead, the *Boateng* court entered summary judgment for the insurer, finding that no reasonable juror could find that GEICO had acted in bad faith and explaining (with uncanny similarity to this case): "GEICO initiated settlement negotiations with Plaintiff and Plaintiff did not respond. Instead, Plaintiff retained an attorney whose first move was to file a bad faith claim against GEICO." *Id.* at *5. In a footnote, the *Boateng* court specifically addressed *Powell* and *Snowden*, correctly stating that, "[i]n both of those cases, insurers failed to engage in settlement negotiations with tort victims. Here, GEICO did contact Plaintiff shortly after the accident to begin the process of settling Plaintiff's claim." *Id.* at *5 n.3.

Here, similar to the claimant in *Boateng*, Plaintiff contends that he (and his counsel) became subjectively suspicious of the insurer (regarding the veracity of the declarations page and the terms of State Farm's proposed release) and, for this reason, refused to settle the claim within the policy limits, later contending that the insurer acted in bad faith by failing to initiate settlement negotiations in a way that would not have made him suspicious.[1] Also as in *Boateng*, Mr. Saner and Attorney Cleary never communicated their subjective concerns to the insurer or communicated a willingness to settle within the policy limits upon dispelling such concerns. Instead, as in *Boateng*, Plaintiff simply rejected State Farm's offer of the policy limits and filed suit. In *Boateng*, the plaintiff imagined that GEICO was trying to trick him into settling both claims for $10,000 without paying a second $10,000 for the wrongful-death claim. Here, Attorney Cleary imagined State Farm was perhaps lying to him about Ms. Sieve or the accuracy of the declarations page disclosing that the policy limits were $25,000. Regardless of the reason for a plaintiff's suspicions, *Boateng* stands for the proposition that the *Powell* duty to initiate settlement negotiations is not a duty to initiate settlement negotiations in a way that is impervious to suspicion. In the absence of a claimant's formal offer to settle for the policy limits, *Powell* requires nothing more than an opening salvo, and it is undisputed that State Farm complied with this requirement. Like *Boateng*, Plaintiff responded by rejecting the policy limits and filing suit, and like

---

[1] It should go without saying that, if subjective suspicion were enough to create liability for bad faith, the law would create a financial incentive to subjectively perceive suspicion where a reasonable person would not.

*Boateng*, State Farm is entitled to summary judgment on the ground that no reasonable jury could find that State Farm acted in bad faith on these facts.

    **B.    Mere negligence alone does not amount to bad faith.**

As a matter of law, "negligent conduct (without more) falls short of 'bad faith.'" *Barnard v. Geico Gen. Ins. Co.*, No. 5:10cv213/RS–CJK, 2011 WL 2039560, at *4 (N.D. Fla. May 25, 2011) (citing *Cardenas v. Geico Cas. Co.*, 760 F. Supp. 2d 1305 (M.D. Fla. 2011)); *accord Kearney v. Auto-Owners Ins. Co.*, 664 F. Supp. 2d 1234, 1242 (M.D. Fla. 2009) ("[N]egligence alone does not amount to bad faith.") (citation omitted). The duty of good faith does not require an insurer to handle a claim "perfectly"; it requires the insurer to refrain from acting solely in its own interests over the interests of its insured. *Robles v. GEICO Indem. Co.*, No. 8:19-cv-1293-T-60AAS, 2020 WL 6566953, at *7 (M.D. Fla. Sept. 29, 2020) (citations omitted), *report and recommendation adopted*, 2020 WL 6565082 (M.D. Fla. Nov. 9, 2020); *accord Welford v. Liberty Ins. Corp.*, 190 F. Supp. 3d 1085, 1092 (N.D. Fla. 2016). In determining whether an insurer's conduct rises to the level of bad faith, the courts consider the "totality of the circumstances." *Baranowski v. Geico Gen. Ins. Co.*, 385 F. Supp. 3d 1267, 1273 (M.D. Fla. 2019). Summary judgment should be granted where the undisputed facts show that, considering the totality of the circumstances, no reasonable jury could conclude the insurer acted in bad faith. *Id.* at 1273-74 (citing *Daniels v. GEICO Gen. Ins. Co.*, 740 Fed. App'x 665, 668 (11th Cir. 2018)).

*No* insurance claim in history has ever been impervious to criticism. For

14

example, a plaintiff can maintain that a settlement offer made within thirty days of an accident should have been made within twenty-nine days, that a *written* offer should have been made *verbally* (or vice-versa) to make it more enticing, that a written settlement offer should have enclosed a check, that an offer with a check should have also included an affidavit assuring the claimant that the insurer was not lying about the policy limits, or that the insurer should have done something more to make the offer more enticing and harder to reject. Summary judgment in favor of an insurer is nevertheless appropriate in cases where an insurer has failed to anticipate the enticements desired (but not communicated) by a particular claimant, or even where the insurer knew but failed to provide them, so long as no reasonable jury could find that such failure was the result of the insurer's decision to subvert its insured's interests in favor of its own. *See Baranowski*, 385 F. Supp 3d at 1276.

To give some concrete examples, *Baranowski* involved an insurer that, like State Farm here, authorized a settlement offer for its insured's policy limits in exchange for a release of its insured. 385 F. Supp. 3d. at 1270. Notwithstanding, its claim handling was not perfect: it accidentally addressed its settlement offer to the *insured's* attorney instead of the *claimant's* attorney, prematurely sent a letter stating that a settlement agreement had been reached when one had not been, sent a release that was broader than what the claimant wanted, and (purportedly) failed to provide a statutory insurance disclosure within the twenty-day deadline imposed by the claimant. *Id*. at 1270-72. When opposing summary judgment, the plaintiff contended that the amalgamation of these imperfections could support a jury finding of bad faith, offering

15

the additional rationale that they were "circumstantial evidence of incompetence" and demonstrated that the insurer should have improved its claims-handling process. *Id.* at 1275. Rejecting this, the district court entered summary judgment for the insurer, explaining that the list of imperfections, whether caused by negligence or even carelessness, as a matter of law did not rise to the level of bad faith, nor could a reasonable jury find that the case could or would have settled for the policy limit if the imperfections had not been present. *Id.* at 1276-77. Similarly, in *Coulter v. State Farm Mutual Automobile Insurance Co.*, 614 Fed. App'x 998 (11th Cir. 2015), the Eleventh Circuit affirmed summary judgment for an insurer when a claimant refused to settle a claim because his attorney deemed the insured's no-other-coverage affidavit to be late and not worded to his liking, explaining that "[a]ny failure in exactly matching the terms of [the] settlement demands was, at most, negligent" and that "no reasonable jury could find that State Farm had failed to settle in bad faith." *Id.* at 1001.

### C.   No reasonable jury could conclude from the record that State Farm acted in bad faith.

Here, the evidence is insufficient to support a jury verdict in Plaintiff's favor. Based on the undisputed facts outlined above (and as set forth in Defendant's Statement of Material Facts, ECF No. 24), no reasonable jury could conclude that State Farm acted in bad faith.  Plaintiff has not, and cannot, come forward with evidence that would support such a finding of bad faith.  As a matter of law, State Farm acted reasonably and with due regard for the interests of its insured (the Estate of Mr. Schnierle).  Thus, summary judgment should be entered in favor of Defendant.

16

### 1.    The policy limits were offered 11 days after the accident

It is undisputed State Farm offered its policy limits within 11 days of the accident.2 (ECF No. 24 ¶ 10.) Specifically, on November 10, 2021, State Farm spoke with Ms. Saner's surviving spouse, James Saner, and offered the policy limits. Later that day, State Farm sent a letter to Mr. Saner, along with a release for him to sign. ECF No. 24 ¶¶ 10, 11.) The letter stated, "Enclosed is the Release confirming our settlement agreement in the amount of $25,000.  After the Release is properly signed, dated, and returned to this office, we will forward payment….  If you have any questions, please contact us." (ECF No. 24 ¶ 11.)

### 2.    State Farm was not required to tender its limits to an unrepresented third-party claimant

Contrary to Plaintiff's assertion, State Farm was not required to tender (i.e., deliver) the policy limits to Mr. Saner. Plaintiff alleges State Farm acted in bad faith because it merely offered the policy limits to Mr. Saner, rather than physically delivering the check to him. (Complaint at ECF No. 1 ¶ 23.) In support of the foregoing contention, Plaintiff relies on *Powell v. Prudential & Cas. Ins. Co.*, 584 So. 2d 12 (Fla. 3d DCA 1991) for the proposition that "where liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer can be liable for bad faith "for failing to tender its policy limits even before a settlement demand from the plaintiff." (ECF No. 1 at paragraph 23.) In fact, *Powell* did not address the issue of

---

[2] To put that in context, in *Montanez v. Liberty Mut. Fire Ins. Co.*, the Eleventh Circuit affirmed summary judgment for an insurer where the insurer waited 32 days and, instead of tendering the full policy limit, proposed a global settlement conference. 824 Fed. App'x 905, 912 (11th Cir. 2020).

whether a tender of the policy limits, rather than a mere offer of the policy limits, was required. Moreover, there is no language in *Powell* requiring an insurer to "tender" a check to an unrepresented surviving spouse asserting a wrongful death claim.

No Florida law or industry standard requires a liability insurer to tender its policy limits to an unrepresented third-party claimant without first securing an executed release to protect its insured. Here, because Mr. Saner was not represented by counsel, State Farm asked him to sign a release and return it to State Farm, at which point State Farm would deliver the check to Mr. Saner. (ECF No. 24 ¶ 13.) By asking Mr. Willis to simply sign and return the release himself – rather that requiring Mr. Saner to open an estate for his wife so that a court-appointed personal representative could sign the release – State Farm was attempting to facilitate the settlement while protecting its insured.

There is no evidence suggesting State Farm could have settled the claim if it had tendered the policy limits to Attorney Cleary after State Farm received Attorney Cleary's letter of representation on April 4, 2022. In fact, Plaintiff filed suit two days after State Farm received Attorney Cleary's letter of representation. (ECF No. 24 ¶¶ 29, 32.) Moreover, on April 29, 2022, Attorney Cleary sent an email to State Farm rejecting its settlement offer and accusing State Farm of bad faith based on nine listed reasons. (ECF No. 24 ¶35.) Because the lack of a tender of the policy limits was only one of the nine reasons stated by Attorney Cleary, it is reasonable to conclude that the case would not have settled even if State Farm had tendered the policy limits.

The record shows that Mr. Saner was never willing to settle his wife's wrongful death claim for the $25,000 policy limits and that the lack of a tender of the policy limits was not the reason the case did not settle. It is undisputed that State Farm sent multiple letters to Mr. Saner in an attempt to follow up on its offer of November 10, 2021, including letters on November 30, 2021, January 4, 2022, and February 28, 2022. (ECF No. 24 ¶¶ 17, 20, 23.) In response to those communications, Mr. Saner never complained about the lack of a tender. (ECF No. 24 ¶¶ 16, 19, 25, 26, 27.)

### 3.    State Farm gave Saner an accurate declarations page

The second reason Attorney Cleary gave for not accepting the policy limits was that he thought State Farm provided him (and Mr. Saner) with the incorrect declarations page for the policy.  In fact, as explained more fully above, the record reflects that State Farm provided Plaintiff with an accurate declarations page as part of State Farm's insurance disclosure letter to Mr. Saner on November 17, 2021 and again on November 26, 2021, and as part of State Farm's insurance disclosure letter to Attorney Cleary on May 2, 2022. (ECF No. 24 ¶¶ 14, 16, 40.) Attorney Cleary simply assumed that the declarations page (which shows a "policy period" of October 28, 2019, to January 3, 2020) was incorrect because the subject accident occurred on October 30, 2021 – a date that does not fall between October 28, 2019 to January 3, 2020. If Mr. Saner or Attorney Cleary had read the policy booklet (which State Farm provided to Mr. Saner on November 17, 2021 and to Attorney Cleary on May 2, 2022 as part of State Farm's insurance disclosure letters) and the declarations page (which was sent to Mr. Saner on November 17, 2021 and November 26, 2021 and to Mr.

Cleary on May 2, 2022), they would have understood that a new declarations page is not created upon every policy renewal and thus it is not unusual for an applicable declarations page to pre-date the policy period in which the accident occurred.

### 4.    Naming Sieve on the release was not bad faith

The third reason Attorney Cleary gave for not accepting the policy limits was that he thought the proposed release that State Farm sent to Mr. Saner improperly included, as a released party, Tracy Sieve, who was Mr. Schnierle's fiancé. (ECF No. 24 ¶ 36.) In fact, the record shows that State Farm's inclusion of Ms. Sieve on the release was, at most, simply a mistake and the result of mere negligence. The record shows State Farm added Ms. Sieve to the release because Ms. Sieve told the claim specialist that she was Mr. Schnierle's wife. (ECF No. 24 ¶ 5.) In fact, Ms. Sieve was not Mr. Schnierle's wife. As a matter of law, Ms. Sieve faced no potential liability in connection with the accident, as she was not involved in the accident and did not own the Schnierle vehicle. Thus, because Ms. Sieve faced no potential liability, there was no reason to add her to the release. Neither State Farm nor its insured (Mr. Schnierle's estate) gained anything by adding her to the release; thus, there is no basis for finding that State Farm put its interests ahead of its insured's interests.

Moreover, because Ms. Sieve faced no potential liability in connection with the accident, there was no legitimate reason for Plaintiff to reject State Farm's settlement offer merely because Ms. Sieve's name was on the release. If Plaintiff had any subjective concerns about Ms. Sieve being named on the release, Plaintiff could have simply asked State Farm to remove her. The record reflects, however, that Plaintiff

never communicated to State Farm Plaintiff's purported concern about Ms. Sieve being on the release. Saner claims he called State Farm on that topic, but he admitted he does not recall when he called, who he spoke with on that matter, or what State Farm told him. (ECF No. 24 ¶15.)

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant, State Farm Mutual Automobile Insurance Company, requests entry of a final summary judgment in favor of Defendant and against Plaintiff.

Respectfully submitted,

BUTLER WEIHMULLER KATZ CRAIG LLP

/s/ Brian D. Webb
JOHN W. WEIHMULLER, ESQ.
Florida Bar No.:  0442577
jweihmuller@butler.legal
BRIAN D. WEBB, ESQ.
Florida Bar No.:  0073989
bwebb@butler.legal
Secondary:   khill@butler.legal
mmcnaull@butler.legal
400 N. Ashley Drive, Suite 2300
Tampa, Florida 33602
Telephone:   (813) 281-1900
Facsimile:   (813) 281-0900
*Attorneys for Defendant, State Farm Mutual*
*Automobile Insurance Company*

## CERTIFICATE OF SERVICE

I certify that a copy hereof has been furnished to:

Matthew Thomas Christ, Esq.
Domnick Cunningham & Yaffa
2401 PGA Boulevard, Suite #140

21

Palm Beach Gardens, FL 33410
Email: MTC@pbglaw.com
*Attorney for Plaintiff*

Fred Alan Cunningham, Esq.
Domnick Cunningham & Yaffa
2401 PGA Boulevard, Suite #140
Palm Beach Gardens, FL 33410
Email: Fred@pbglaw.com
*Attorney for Plaintiff*


by electronic notification via the CM/ECF system on June 14, 2024.

/s/Brian D. Webb
_____
BRIAN D. WEBB, ESQ.